I'm going to move to our final case on this morning's calendar, which is Albro v. Spencer. Mr. Harrington. Good morning, Your Honor. May it please the Court, John Harrington for Appellant William Albro, and I'd like to reserve two minutes for rebuttal. Mr. Albro, in his First Amendment complaint, pled sufficient plausible facts to establish a causal link between his rejection of his manager's efforts to recruit him into the Saints and a pattern of discriminatory actions that followed those refusals and culminated in a seven-day suspension in December 2015. What is Mr. Albro seeking here? What relief do you want? Mr. Albro is seeking relief from the suspension, a finding that it was, in fact, discriminatory and retaliatory. But what does that mean? And he wants the suspension removed from his record? Correct, Your Honor. Is he seeking money? He's seeking his attorney's fees and, you know, some amount of non-economic damages to be determined at trial, and certainly he seeks to be allowed to continue his employment with the Navy without any further discrimination or retaliation. I mean, one feature of the timeline here is that earlier in his tenure, it seems that there were more incidents or issues with coworkers who were trying to recruit him into the Church of Latter-day Saints. But as the time goes on, it seems like those efforts stopped or ceased, and then the adverse happen later. And so maybe you can sort of address what's the connection has pled between these different  Thank you, Your Honor. So let me, if I could, kind of highlight the timeline as it has been alleged in Mr. Albro's first amended complaint. He joined the China Lake Weapons Division in 2006, and efforts to recruit him into the Church of Latter-day Saints began in August of 2000, when he became Mr. Albro's supervisor. What's the basis? What's the factual basis for saying that, you know, fast forward to 2015, some nine years later, that when he suffered these adverse employment actions, that what was happening was essentially discrimination because of his earlier refusal not to join the Church? I was trying to answer that question, Your Honor, and I really need to go through the timeline in order to do that. The recruiting efforts continued until 2013, and those efforts came from not just Mr. Washburn, but from Brent Hedman, who is a president of the LDS Church in that area and a division head at China Lake. His son, Trevor Hedman, who was put on Mr. Albro's team by Mr. Washburn, and two other colleagues of Mr. Albro at China Lake. But again, those efforts continued until early 2013, when they were finally abandoned, and that's when the adverse actions or the discriminatory actions began. And this was also shortly after Mr. Washburn became Mr. Albro's supervisor. So there was one theory that Mr. Washburn started recruiting in 2006 and for seven years or so later, tried and failed, and then basically built up the resentment, and then once he became in a position of power, started using that power against Mr. Albro? That is correct, Your Honor. Let me ask you a question about your First Amendment complaint, and I'm curious. Why did the plaintiff allege in the First Amendment complaint that the Navy took adverse employment action in part because of Albro's protected activity? Why was the in part put in there? To be perfectly frank, Your Honor, probably the best explanation is poor drafting on the part of Mr. Albro's attorneys. I wish that that had been phrased differently. I don't think it was necessary to say in part, and it was inartful. Certainly the point, if any, was that there may have been other causes for some of these actions, but that Mr. Albro's protected activity and his refusal to join the Church were certainly a but for cause of the actions that the Navy took, and certainly were in all the instances alleged in that complaint, the straw that broke the camel's back. I think the inclusion of the phrase in part was inartful drafting and should have been phrased differently. I've got one follow up. Is it alleged somewhere in the First Amendment complaint that the individuals who took the protected activity, when they took their actions in March and June of 2015? It is not specifically alleged in the First Amendment complaint that Mr. Bechtel and Mr. Wheelock were aware of this protected activity, although they were through a response he had given to the Notice of Proposed Suspension, it was, you know, an over 200 page complaint. Does it even matter, though? I mean, I took your theory to be, look, you know, the people who actually issued the punishment or the reassignment, they may not have been, they were not members of the Church of Latter-day Saints, they may not have been familiar with the full history, but this whole thing was set in motion by Washburn, and that's where it all leads to. That is correct, Your Honor, and certainly if allowed to proceed, we would be making a cat's paw argument with regard to Mr. Bechtel and Mr. Wheelock. Let me interrupt you, and I apologize. Is it alleged in the First Amendment complaint that Washburn was aware of the protected activity? Again, it's not specifically alleged in the complaint, but it is alleged, you know, a series of actions that, you know, actually accelerated after Mr. Albro first went to his efforts to recruit him and to advantage LDS members at the expense of Mr. Albro. Certainly, I think a fair reading of the complaint is that Mr. Washburn was well aware that Mr. Albro had complained to HR and to his division head. So circumstantially, it's alleged in the complaint? Yes, Your Honor. So, again, there is a pattern of retaliatory discriminatory, well, pattern of discriminatory actions beginning in January 2013. I can go through the list, but they continued through March 2015 up until the time Mr. Albro complained to HR and to his division head. If you could focus on those 2015 adverse actions. To me, the complaint is pretty threadbare on the fact that Washburn was the driving factor for them. You know, I see only allegations that, such as on 96, that Albro learned that management at Washburn's direction planned to move Albro to work under Martin Minthorn. So, at Washburn's direction is a pretty weak allegation. Well, we certainly believe it's sufficient at the pleading stage, Your Honor, and we expect discovery to flesh out the details of that, and we think Mr. Albro is entitled to that discovery, and it's a plausible allegation, and it's supported by the allegations in the complaint. Certainly, Mr. Washburn was responsible for putting Mr. Albro under Martin Minthorn. That was Mr. Washburn's direct decision, and that was an effect of the motion for Mr. Albro, and it was Mr. Washburn who removed Mr. Albro's laboratory and equipment and prohibited him in early 2016 from owning equipment in the future. So I think Mr. Washburn's involvement in these decisions, including the appointment of LDS member Robert Long to lead the inquiry that led to Mr. Albro's suspension is plausibly alleged, and Mr. Albro should be entitled to discovery to supplement the record. So we clearly believe the district court erred in finding that Mr. Albro did not engage in protective activity under Title VII when he went to HR and his division head in March of 2015 and said that he did not think Mr. Washburn should be his supervisor because he tried to recruit him into the church, and he reported that he thought Mr. Washburn was treating LDS members more favorably than he was treating Mr. Albro, and he renewed that report in a second meeting with those two same, the HR representative and division head in June of 2015, and after that second report in June of 2015, that's when he learned that Mr. Washburn was planning to move him under Mr. Minthorn and take his lab and equipment. Two weeks later, locks were cut off a secure area in his lab. He was recommended to have a security clearance removed, required to undergo a psychological exam, and then the inquiry by Robert Long was launched in July of 2015, leading up to the suspension in December 2015. So we think the lower court found large gaps in the time period, and I know we're talking about ultimately a period of time from 2006 through early 2016, but again, as I've tried to explain, I think there is a series of actions that, of intervening conduct on the part of the Navy, that severely truncates the gaps in time. But he still works at this facility? He does, Your Honor. Well, maybe I would suggest that unless my colleagues have questions, that you reserve the remaining time, and unless you have anything you'd like to add now, Mr. Harrington? No, I'll reserve the time for rebuttal. Thank you, Your Honor. Mr. Carter, I'd be pleased to hear from you. Good morning, Your Honors, and may it please the court. Dean Carter on behalf of the Secretary of the Navy. Your Honor, I'd like to begin by just addressing a few points that Judge Reyes had regarding the knowledge of the decision-makers. There are no allegations, even circumstantial allegations, that either Bechtel, the fourth-level supervisor, or Wheelock, the third-level supervisor, had knowledge of the protected activity. Likewise, there are no allegations that Robert Long, the investigator, had knowledge of the protected activity. And... That may be, but is that sufficient to conclude that the complaint must be dismissed? On the retaliation claim, Your Honor, I don't believe that this court has ever held that a retaliation claim could proceed where the decision-makers don't have knowledge. Okay, on the retaliation claim. That's correct, Your Honors. And similarly, with respect to the disparate treatment claim, again, there are no allegations that either Bechtel or Wheelock, the decision-makers, were members of the LDS Church. But there are allegations that they acted at the direction of Washburn. Yes, Your Honor, there are allegations that they acted at the direction of Washburn. Why is that not enough? Well, in the Supreme Court's decision in Iqbal, those were precisely the types of allegations that the court there held are not enough. There, the court was considering allegations that FBI Director Robert Mueller and the Muslim men. But the court said that's simply not enough. It's not enough to say that it was at the direction of Muslim. I'm sorry to interrupt you. I mean, a lot of the issues that are more acute in the case happened in the earlier part of the timeline. I recognize there are allegations of continuing the issues, but some of the earlier ones seem more problematic. If Washburn had taken over as supervisor, say, around 2011, 2012, and if Long had begun that investigation and report around 2012, would this be a different case? It could be, Your Honor. And again, I think if we were to read in new allegations, yes, we can change the facts and perhaps it could be sufficient. But again, that's not what we have here. There are, on the one hand, you have several facts about Washburn and some facts of various co-workers. On the other hand, you have years later the decisions by Bechtel and Wheelock. To my knowledge, there are no allegations in the amended complaint that touch on really any religious discussions or any religious actions or anything that was done in the two years before. Isn't it a fair reading of the theory of the complaint, essentially, that there was aggressive efforts to recruit him to be a member of the Church of Latter-day Saints and those efforts lasted over a period of years and were ultimately unsuccessful, but didn't exactly leave people feeling happy with each other once those recruiting efforts ended because they were fruitless? And that all of this really stems back to those initial interactions. Well, Your Honor, again, I don't see how you get from he's dissatisfied with his supervisor, his supervisor maybe is dissatisfied with him, in 2013 to, well, later these decision-makers who we don't even know. Who is Bechtel and who is Wheelock? Do they have any interactions with Washburn? What kinds of interactions do they have? We don't have any knowledge that there's any connection. Excuse me, I apologize, but isn't that something you flesh out in discovery? I mean, we're just talking about the allegations and the complaint now. Well, I think you have to, at the end of the day, the plaintiff doesn't have a high burden at the pleading stage, but there is a burden. There's a burden to show that the decision-makers acted either with a retaliatory motive or a discriminatory motive or, in this case, alleging both. But there has to be allegations aside from conclusory allegations that say that Mr. Albro was discriminated against because of a protected status. And there's simply no allegations that these three adverse actions that began in 2015. Counsel, isn't the standard just plausibility? And it does seem plausible that Mr. Washburn tried to recruit Mr. Albro for many years and was resentful for that and wasn't in a position to do anything about it until he became in a position of power, which was in, what, 2013 or 12. And being in that position of power, he was then able to influence the management to then have adverse actions against Mr. Albro in 2015. I don't know why that's not plausible. I agree that the allegations are pretty threadbare, but it seems plausible. Well, again, Your Honor, what the Supreme Court held in Iqbal is simply alleging at the direction of, that's a conclusory allegation that the court need not accept as true. And that's really all we have here. We don't have any facts. Well, is it conclusory more about whether when an allegation is just a legal conclusion? This seems like a factual allegation, at the direction of seems like a factual allegation. To me, a conclusory allegation is, you know, he discriminated on the basis of, you know, using a legal conclusion. But this seems just like a factual thing. Let me just follow up on that. How would he draft that? Right. How would it be drafted where you'd say something that explains what you think should be more detailed? Well, Your Honor, I think when you look at the allegations here, you have allegations that Washburn was directing and influencing, you know, a member of HR who's not a member of the LDS Church, his second-level supervisor who's not a member of the LDS Church, an independent investigator who's not a member of the LDS Church, various co-workers who are not members of the LDS Church, two high-level decision makers who are not members of the LDS Church. The scope of influence that Washburn would have to have would have to be massive. He was a supervisor. I mean, some of these things could get cleared up in discovery. There's a number of references to reports. You know, the content of those reports is going to matter. The government can argue that Mr. Albro was a difficult employee who was poor performing and that this was all warranted. And Mr. Albro can say there's a different story here. And it all leads back to antagonism towards me and my family for not joining the Church of Latter-day Saints, and that will get fleshed out. But, I mean, on the face of this, I'm not sure we're able to just say you're right as a matter of law. Well, there are simply no allegations, for example, that Washburn even knew about, not just the protected activity, but the investigation by Mr. Long. The only allegations of any kind of knowledge or involvement by Washburn in any of these decisions is that they were done at the influence or direction. Right. Would you concede if it said that they did it because Washburn told them to? Would it have been enough? I think, again, to say kind of in a conclusory fashion that he just told them to for all of these actions, it's just simply not plausible, I think, at a certain point. What about, you know, for example, allegations of discussions that they had with the supervisors or that they met or that Washburn regularly did this to other co-workers. And it's, again, the standard is not a high standard. It's not a high burden of proof. Rule 11 permits the appellant to plead upon information and belief. But there's simply nothing of the sort here. There could be, but there isn't. There are no allegations that Washburn had any discussions with any of these people. There are no allegations that Bechtel or Wheelock even really know much about Washburn or have any involvement with them. Instead, the allegations are that the decisions were made based on the report, the independent report by Robert Long. So how you get from these actions in late 2015 to linking those to things that occurred maybe two years earlier, it seems to—maybe it's conceivable, Your Honor, but, again, what the Supreme Court has held that it must be more than conceivable. It has to be plausible. And there needs to be— with the management to try to get Mr. Albrow in trouble. We don't even know that Washburn had influence with the management other than Mr. Albrow say so. It just simply says it. Yeah, that's why we have discovery. Well, I guess I would disagree, Your Honor. I think if the plaintiff at the pleading stage can't meet the simple burden to say that there is some factual connection between this discontent he had with his supervisor and these—you know, and there's the alleged discriminatory motive that his first-level supervisor had and decisions that were made some two years later, there must be some factual allegations that plausibly link those. If not, then what would prevent a plaintiff from proceeding just by simply saying these various workplace incidents were taken because of gender or because of some other basis? Those types of allegations seem just wholly generic that could be changed at will. And the only real allegations about members of the LDS Church, again, the recruitment efforts ceased in 2013. The allegations pertaining to Washburn are even—ceased even earlier than that, and I believe most of them are between 2006 and 2010. So to take that from it being conceivable that those were some—there's a longstanding grudge to it being plausible, I think that there needs to be something in the meantime, something about Washburn's relationships or his effects with management, something about how other co-workers were treated. Well, didn't they mention that he became a supervisor in 1213? So why isn't that not the change? That you're talking about? Well, Your Honor, I think that the fact that something—well, something—the fact that something bad happens, that an employee gets disciplined, and that the supervisor is, you know, essentially of a different religion, I don't know that there's really any connection. I mean, yes, he became a supervisor, but how did he use his influence as a supervisor to affect these decisions or to even cause the alleged workplace estimates? Again, you have—the allegations are that, for example, he gets removed from an email list or that his office supplies go missing and that these were at the direction of Washburn or because he's not a member of the LDS Church. But these types of incidents happen all the time to many employees. Your Honor, let me shift gears just for a second. Let's talk about causation for a second. I'm trying to understand how can a cause of a result not be a but-for cause? I'm not following that. Well, it's not our position that—and I'm not sure if you're speaking with respect to retaliation. Yeah, I'm talking about retaliation, the allegation that it was in part a cause. If you take—if anything is a cause, by definition, isn't it a but-for cause? I mean, if it's not there, it doesn't cause it. So how is it an in-part cause, not a but-for cause? Well, I mean, to say that it's just simply he was retaliated against in part because he complained to—he made a—he had a protected activity, that's not—I don't think the exact wording is it's in part a cause. I think it's more that he was—the motivation was in part because of the protected activity. So I think that's what the dismissal order is saying. But I think regardless of that, Your Honor, I mean, even conceding that perhaps it's a drafting error, that's not—I think the point is that there are simply no allegations that support that there is any—that it had any role—that the protected activity had any role whatsoever in the ultimate adverse actions. Again, none of these decision-makers are alleged to even be aware of the protected activities. The independent investigator— So let me just make sure I understand. The causation argument you're making isn't based on the drafting of the First Amendment complaint where it says it was caused in part. You're saying there weren't allegations showing that the activities taken were not  Well, it's both, Your Honor. I think our primary argument is that there are simply no factual allegations. I think the—to say that it was caused in part, we believe it's—the plaintiff is essentially conceding that we don't know whether this is the but-for cause or simply a lesser cause. Well, hang on a second. How can there be a lesser cause? If anything caused the event, it's a but-for cause, isn't it? Even if it was part of the cause. If you take out that part, then it doesn't happen. It's not a cause. I think that may be the case, Your Honor, but again, I don't think that's how the amended complaint is drafted. And regardless of that, again, our position is that there's simply no allegations that the protected activities had any—motivated at all the decision-makers. There's just no connection there. And again, there are no allegations that Washburn even knew about the protected activities. So even assuming that he exerted influence on these decision-makers, if he's not aware of the protected activities and they're not aware of the protected activities, then how can you have retaliation? Again, I'm not aware that this Court has ever held that you can have retaliation under such circumstances. I think it's not—it's not even in a conclusory fashion. Thank you, Mr. Carter. I think we've let you go over your time, and so we're going to turn back to Mr. Harrington for rebuttal. Thank you, Your Honor. I think the discussion has highlighted a number of issues that discovery is required to address, and Mr. Albro has, I think, very plausibly alleged sufficient facts to permit him to take discovery regarding the knowledge of Mr. Washburn regarding his protected activity in March and June of 2015. He has—Albro's complaint is—has very plausible allegations showing that Mr. Washburn was involved in a number of discriminatory actions that showed animus toward Mr. Albro immediately after he went to HR and his division head the second time in June of 2015. Locks were cut off in a secure area in his lab. The—Mr. Washburn was involved in recommending that his security clearance be removed and then he had to do a psych exam. I mentioned those things before, and these things led directly into the inquiry by Robert Long. And we have—Mr. Albro has identified a number of LDS members, you know, in his complaint specifically who were involved in the recruiting efforts and who then were involved in these later actions. Mr. Washburn was a branch head. Brent Hedman is a division head at China Lake. He was still attempting to recruit Mr. Albro in 2011. Mr. Washburn put Brent Hedman's son Trevor on Mr. Albro's team. Counsel, can you address opposing counsel's argument that if there's no allegation of knowledge of the protected activity by the decision makers of the adverse action, you can't form a retaliation claim? Certainly, at summary judgment stage, we will need to show some knowledge on the part of decision makers or those who were influencing decision makers that they were aware that Mr. Albro had— But why don't you have to plead it also? Yeah, I'm struggling with that, Your Honor. You know, Mr. Albro does not have that information specific—you know, available to him. You know, he can speculate, but I think it's a fair reading of, you know, the sequence of events here in terms of his rejection of the recruiting efforts continuously and then, you know, the actions that began in 2013 and then escalated after he went to HR and his division head. It is not, I agree, not explicitly alleged that Mr. Washburn knew that he had gone to HR in March and June of 2015 because Mr. Albro doesn't know that. But we believe he's entitled to discovery to establish it. And once it's established, I think his retaliation claim will be very viable. But again, certainly after Twombly and Iqbal, there's still no probability requirement at the pleading stage. The only plausibility requirement is that the allegations be plausible enough to entitle one to discovery that might reveal evidence to support the claims. And we think Mr. Albro has more than met his burden at the pleading stage. Thank you, Mr. Harrington. I want to thank both counsel for their briefing and arguments, which have been most helpful to the court. Judge Bumate and I would, again, like to thank Judge Reyes and the panel collectively. Thanks, court staff, for being here today. This case is submitted and that concludes our cases for the week. Thank you. Thank you, Your Honor.
judges: Bress, Bumatay, Rayes